# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SCOTT A. HODES,

               *Plaintiff*,

      v.

U.S. DEPARTMENT OF TREASURY, *et al.*,

               *Defendants*.

Civil Action No. 17-cv-0219 (DLF)

## MEMORANDUM OPINION

Plaintiff Scott A. Hodes seeks information about four contracts the Internal Revenue Service (IRS) awarded to private companies to outsource debt collection for certain IRS tax liabilities. Hodes filed this lawsuit after the IRS refused to disclose the contracts' commission percentage rates in response to his request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Before the Court are four pending motions: (1) the Department of Treasury's Motion to Dismiss the Complaint as Against It, Dkt. 12; (2) the IRS's Motion for Summary Judgment on Plaintiff's FOIA Claim, Dkt. 13; (3) Intervenor Continental Service Group, Inc.'s (ConServe) Motion for Summary Judgment, Dkt. 14; and (4) Hodes's Cross-Motion for Summary Judgment, Dkt. 16. For the reasons that follow, the Court will grant the IRS's and ConServe's motions for summary judgment, deny Hodes's Cross-Motion for Summary Judgment, and deny as moot Treasury's motion to dismiss.

# I.    BACKGROUND

On September 23, 2016, the IRS awarded task order contracts to four debt collection companies under a new program to outsource the collection of certain delinquent tax liabilities.[1] IRS's Statement of Facts ¶¶ 2, 3, 6, Dkt. 13-2[2]; Gregory Decl. ¶¶ 4, 6, 7, Dkt. 13-5.  The task order contracts include a base period contract and future options for four additional years. Gregory Decl. ¶ 12.  Four days after the awards, Hodes submitted a FOIA request to the IRS requesting the contracts, including the "pricing percentage rates to be paid to the contractors."[3] IRS's Statement of Facts ¶¶ 1, 2; Minauro Decl. Ex. A, Dkt. 13-4.  The IRS gave Hodes copies of the contracts but invoked FOIA exemption 4 to redact and withhold the pricing percentage rates (or "commission percentages") that the IRS agreed to pay the debt collection companies. IRS's Statement of Facts ¶¶ 4, 5, 7.  Exemption 4 protects "matters that are . . . trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).

Hodes filed an administrative appeal of the IRS's decision to redact and withhold the commission percentages.  IRS's Statement of Facts ¶¶ 11, 14.  After the IRS denied his

_____

[1] The new debt-collection program was prompted by the Fixing America's Surface Transportation Act (FAST Act), Pub. L. No. 114-94, 129 Stat. 1312 (Dec. 4, 2015), which mandated that the IRS "enter into one or more qualified tax collection contracts for the collection of all outstanding inactive tax receivables," Pub. L. No. 114-94, § 32102(a), 129 Stat. 1312, 1733.

[2] Except as otherwise noted, Hodes does not dispute the facts in the IRS's Statement of Undisputed Material Facts, Dkt. 13-2.  *See* Pl.'s Statement of Material Facts Not in Dispute, Dkt. 16-1 (stating that relevant facts in the IRS's statement are admitted).  The Court therefore dispenses with parallel citations to Hodes's statement of facts.

[3] Hodes also asked for the request for proposal (RFP) and any addenda, although it appears that the IRS issued a request for quotations (RFQ) under the four contractors' existing General Services Administration's Financial and Business Solutions Schedule 520 Special Item Number 4 contracts and not a RFP.  *See* Gregory Decl. ¶¶ 6, 10.

administrative appeal, Hodes filed this lawsuit on February 1, 2017, naming both the IRS and the United States Department of the Treasury as defendants. *See* Compl. at 1, Dkt. 1. Hodes does not dispute the adequacy of the IRS's search, but he challenges the IRS's decision to redact and withhold commission percentages under exemption 4. Pl.'s Cross-Mot. at 1, Dkt. 16-2.

On June 16, 2017, the Department of Treasury moved for dismissal under Rule 12(c) of the Federal Rules of Civil Procedure. *See* Treasury's Mot. to Dismiss at 1, Dkt. 12. Because Hodes never submitted a FOIA request to Treasury, Treasury argues that it cannot provide any relief apart from that available from the IRS, which is a bureau of Treasury. Treasury's Mem. at 1, Dkt. 12-1. Hodes insists that Treasury must remain in the case because it is the "agency," as defined by FOIA, and the IRS is merely its "component." Pl.'s Opp'n to Dismissal at 2, Dkt. 15-1.

The same day that Treasury moved to dismiss, the IRS moved for summary judgment on the ground that FOIA exemption 4 shields commission percentages from disclosure. *See* IRS's Mot. at 1, Dkt. 13. Intervenor ConServe, one of the four task order contract awardees, subsequently filed a motion for summary judgment supporting the IRS's position. ConServe's Mot. at 1, Dkt. 14. Hodes then filed a competing cross-motion for summary judgment. Pl.'s Cross-Mot. at 1, Dkt. 16.

## II.    LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" and, viewing the evidence in the light most favorable to the nonmoving party, "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Paige v. Drug Enforcement Admin.*, 665 F.3d 1355, 1358 (D.C. Cir. 2012). "A dispute is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Paige*, 665 F.3d at 1358 (internal quotation marks omitted). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]hese general standards under rule 56 apply with equal force in the FOIA context." *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

To prevail under Rule 56, a federal agency "must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from [FOIA's] inspection requirements." *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) (quoting *Nat'l Cable Television Ass'n, Inc. v. F.C.C.*, 479 F.2d 183, 186 (D.C. Cir. 1973)). "[T]he strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). "That burden remains with the agency when it seeks to justify the redaction of identifying information in a particular document as well as when it seeks to withhold an entire document." *Id.* (citing 5 U.S.C. § 552(a)(4)(B)).

An agency "can meet this burden through affidavits or declarations that describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *People for the Ethical Treatment of Animals v. U.S. Dep't of Health & Human Servs.*, No. 16-5269, 2018 WL 4000478, at *2 (D.C. Cir. Aug. 17, 2018) (internal quotation marks omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wolf v. C.I.A.*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (internal quotation marks omitted).

### III.   ANALYSIS

The sole issue in this case is whether the commission percentages that the IRS redacted from the debt-collection task order contracts are exempt from disclosure under FOIA exemption 4.  *See* IRS's Mem. at 3, 11–15, Dkt. 13-1.  Exemption 4 protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  There is no dispute that the information Hodes seeks is "commercial or financial information" that was "obtained from a person."[4]  Pl.'s Cross-Mot. Br. at 3 n.1, Dkt. 16 (conceding these points).  The question is whether the commission percentages are "confidential" under exemption 4.

According to the two-prong test set forth in *National Parks and Conservation Association v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), commercial or financial information is

---

[4] Although the parties do not dispute that the commission percentages were "obtained from a person," at least two judges on the D.C. Circuit have questioned the rationale for treating prices paid by the government as "obtained from a person" under FOIA exemption 4.  *See Canadian Commercial Corp. v. Dep't of Air Force*, 514 F.3d 37, 43 (D.C. Cir. 2008) (Tatel, J., concurring) (stating that Judge Garland "rightly questioned 'whether it makes sense to regard prices actually paid *by the government* . . . as confidential commercial or financial information 'obtained from a person' under Exemption Four of FOIA") (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1203 (D.C. Cir. 2004) (*McDonnell Douglas II*) (Garland, J., dissenting)); *McDonnell Douglas II*, 375 F.3d at 1203 (Garland, J., dissenting) (suggesting that the court should "think hard" about whether government contract pricing should be viewed as "obtained from a person" under FOIA exemption 4).  And the Second Circuit has held that information contained in "the agency's own executive actions," such as information the Federal Reserve obtains from private borrowing banks and uses to generate the Reserve's loan documents, is not "obtained from a person" for purposes of FOIA exemption 4.  *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 148 (2d Cir. 2010) ("The fact that information *about* an individual can sometimes be inferred from information *generated within an agency* does not mean that such information was *obtained from* that person within the meaning of FOIA.").  This Court must, however, adhere to controlling precedent that treats government contract prices as "obtained from a person" (i.e., the contractor) under FOIA exemption 4.  *See, e.g.*, *McDonnell Douglas II*, 375 F.3d at 1187–88 (treating line-item pricing in government contract as "obtained from" the contractor).

"confidential" under exemption 4 if it was required to be submitted to the government,[5] and its

disclosure would (1) impair the agency's ability to get necessary information in the future, or (2)

substantially harm the competitive position of the person who provided the information.

*Canadian Commercial*, 514 F.3d at 39 (quoting *Nat'l Parks & Conservation Ass'n*, 498 F.2d at

770); *see also Critical Mass Energy Project v. NRC*, 975 F.2d 871, 880 (D.C. Cir. 1992) (en

banc).  This "test is an objective one."  *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*,

690 F.2d 252, 268 (D.C. Cir. 1982).

The first prong of the *National Parks* test—which addresses whether disclosure would

impair the agency's ability to get necessary information in the future—requires the Court to

consider "whether the impairment is significant enough to justify withholding the information."

*Id.* at 269.  "A minor impairment cannot overcome the disclosure mandate of FOIA."  *Id.*

Ordinarily, "[t]he agency is in the best position to determine the effect of disclosure on its ability

to obtain necessary technical information."  *Orion Research Inc. v. Envtl. Prot. Agency*, 615 F.2d

551, 554 (1st Cir. 1980).  However, "conclusory and generalized assertions are not enough to

establish the requisite risk of impairment."  *Niagara Mohawk Power Corp. v. U.S. Dep't of

Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999).  In the final analysis, the impairment inquiry

"necessarily involves a rough balancing of the extent of impairment and the importance of the

information against the public interest in disclosure."  *Wash. Post*, 690 F.2d at 269.  "When we

---

[5] No party has questioned the involuntariness of the contractors' submissions of commission percentages in response to the IRS's request for quotations.  Thus, it is undisputed that the pricing information was "required" to be submitted.  *See McDonnell Douglas II*, 375 F.3d at 1187 ("That McDonnell Douglas was required to provide to the Air Force the option year prices and the information in the CLINs in order to compete for the contract is undisputed.  That is no doubt why the parties agree the standard set out in *National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C.Cir.1974) . . . governs whether the contested information falls within the scope of Exemption 4.")

refer to a 'rough balancing' under exemption 4, we mean that information will be withheld only when the affirmative interests in disclosure on the one side are outweighed by the factors identified in *National Parks I* (and its progeny) militating against disclosure on the other side." *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 327 (D.C. Cir. 1989).

Under the second prong—whether disclosure would substantially harm the submitter's competitive position—an agency is not required to show actual competitive harm, *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1291 (D.C. Cir. 1983); instead, an agency may show "both actual competition and a likelihood of substantial competitive injury." *Jurewicz v. U.S. Dep't of Agric.*, 741 F.3d 1326, 1331 (D.C. Cir. 2014). Although "[c]onclusory and generalized allegations of substantial competitive harm" are "unacceptable," "the court need not conduct a sophisticated economic analysis of the likely effects of disclosure." *Pub. Citizen Health Research Grp.*, 704 F.2d at 1291. When reviewing an agency's determination of substantial competitive harm, courts in this Circuit "recognize that predictive judgments are not capable of exact proof" and will "generally defer to the agency's predictive judgments as to the repercussions of disclosure." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 563 (D.C. Cir. 2010) (internal quotation marks and citations omitted).

### A. Whether the Commission Percentages Are Line-Item or Total Prices

As an initial matter, the parties dispute whether the commission percentages are line-item or total prices. Both the IRS and ConServe argue that the commission percentages are line-item prices exempt from disclosure, *see* IRS's Reply at 5, Dkt. 19; ConServe's Opp'n. at 4–5, Dkt. 21, while Hodes insists that the commission percentages constitute the "final price the government is paying for the contract," Pl.'s Cross-Mot. Br. at 4, Dkt. 16-2. In Hodes's view, the commission percentages "do not describe specific parts of deliverables" but "are the complete deliverable

themselves." *Id.* This distinction matters because the D.C. Circuit has made clear that line-item prices may be protected by FOIA exemption 4 if they satisfy the *National Parks* test. *See Canadian Commercial*, 514 F.3d at 40 ("We reaffirm today what we have held twice before: Constituent or line-item pricing information in a Government contract falls within Exemption 4 of the FOIA if its disclosure would impair the government's ability to obtain necessary information in the future or cause substantial harm to the competitive position of the person from whom the information was obtained." (internal quotation marks omitted)). But the Circuit has expressed a strong reluctance to protect total contract prices under exemption 4. *See*, *e.g.*, *McDonnell Douglas II*, 375 F.3d at 1193 ("[T]he total contract price paid by the Government is routinely made public . . . ." (internal quotation marks omitted)); *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 306 (D.C. Cir. 1999) (*McDonnell Douglas I*) (noting that "[i]t is undisputed that the total price of the contract may be made public"); *AAR Airlift Grp., Inc. v. U.S. Transp. Command*, 161 F. Supp. 3d 37, 42 n.2 (D.D.C. 2015) (stating that "it is highly dubious that the total contract award price could ever be covered by Exemption 4").

In support of its position that the commission percentages are line-item prices, the IRS offers the declaration of Joseph Gregory, a Division Director at the IRS's Office of Business Operations in Maryland who has 30 years of contracting experience, including 17 years as a contracting officer. *See*, *e.g.*, Gregory Decl. ¶¶ 2–3, Dkt. 13-5. Gregory's declaration describes in detail the contracting process that applied to the task order contracts at issue here.

According to Gregory, the IRS requested quotations from four companies, including ConServe.[6] *Id.* ¶ 10. The IRS's request for quotations required the competing companies to

---

[6] The FAST Act mandates that the IRS give contracting priority to companies on the Bureau of Fiscal Services Debt Collection Schedule. Gregory Decl. ¶ 10. Thus, the IRS consulted the General Services Administration's Financial and Business Solutions Schedule 520 Special Item

provide pricing information for the base year and four option periods. *Id.* ¶¶ 9, 10, 12. Most relevant here, the IRS required the competing companies to propose commission percentages that would apply to the collection of four separate categories of taxpayer debt:

- (1) Individual taxpayer accounts with balances of $10,000 or less
- (2) Individual taxpayer accounts with balances of $10,001–$50,000
- (3) Individual taxpayer accounts with balances of $50,001 and above
- (4) Other account types

*Id.* ¶ 11. Although the bidding companies' publicly available General Services Administration (GSA) schedule contracts set the "ceiling for the commission percentage that the company may propose when competing for a government contract," most of the companies' proposed commission percentages were less than those reflected on their respective GSA schedules. *Id.* ¶ 13.

As reflected in the chart and equations below, the commission percentages are multipliers used to calculate the price of four separate line items: (1) debt collections involving debts of $10,000 or less; (2) debts between $10,001–$50,000; (3) debts $50,001 and greater; and (4) non-individual taxpayer debts of any amount. *Id.* ¶¶ 11–12. For this reason, the commission percentages more closely resemble line-item (as opposed to total) prices. Each line-item price is the commission percentage multiplied by the total dollar amount of tax debt collected within each category.[7] And the total price is the sum of all four line-item prices. In this sense, each

---

Number 4 (Debt Collection) schedule, a Professional Services Schedule under which each of the four companies had existing contracts. *Id.* ¶ 10; *see also* Lang Decl. ¶¶ 8, 9, 10, Dkt. 14-2 (explaining that the IRS issued the request for quotations to companies with General Services Administration Professional Services Schedule contracts).

[7] As Gregory explains, "[f]or example, if the line item '21%' were redacted from a task order before being released to the FOIA requester, that means that under the task order that particular contractor would receive $0.21 for each one dollar of tax debt it collected" in a particular category. Gregory Decl. ¶ 5.

commission percentage is no different than a typical mark up in a contract that includes prices for various line-item goods or services.  *See*, *e.g.*, *McDonnell Douglas I*, 180 F.3d at 304 (proposed prices for several launch missions and various other launch-related services held to be line items protected under exemption 4).

The following chart and corresponding equations illustrate how the various commission percentages are used to calculate line-item prices for each category of debt and how the line-item prices are then aggregated to calculate the total contract price:

| Category 1 | debts $10,000 or less | $$ debt collected | commission % 1 | **line-item price 1** |
| Category 2 | debts $10,001-$50,000 | $$ debt collected | commission % 2 | **line-item price 2** |
| Category 3 | debts $50,001 and above | $$ debt collected | commission % 3 | **line-item price 3** |
| Category 4 | Non-individual taxpayer debts | $$ debt collected | commission % 4 | **line-item price 4** |
| | | | | **TOTAL CONTRACT PRICE** |

**<u>Line-Item Prices</u> = $$ amount of debts collected multiplied by commission percentage**

**<u>Total Contact Price</u> = Line-Item Prices 1 + 2 + 3 + 4**

This interpretation of the commission percentages is not only consistent with the view expressed by Gregory, a contracting officer with extensive experience, but also consistent with the plain meaning of the term "total" contract price: the aggregate amount that the government pays for goods or services—in this case, taxpayer debt collection services for four separate categories of debt.  Each individual commission percentage is not even a dollar price at all; rather, it is just one of several figures used to calculate the total contract price.

To support his argument that each commission percentage is a *total* (or "final") contract price subject to disclosure under exemption 4, Hodes relies on two 1980s cases—*Racal-Milgo Government Systems, Inc. v. Small Business Administration*, 559 F. Supp. 4 (D.D.C. 1981), and *AT&T Information Systems, Inc. v. General Services Administration*, 627 F. Supp. 1396 (D.D.C. 1986). In both cases, courts applied the *National Parks* test to unit (or line-item) prices and held that the party seeking to prevent disclosure failed to demonstrate that the unit pricing was "confidential" and thus exempt from disclosure under exemption 4. *See Racal-Milgo Gov't Sys.*, 559 F. Supp. at 5 (unit pricing not exempt under exemption 4 because the government did not prove that disclosure would either impair its ability to obtain necessary information in the future or cause substantial harm to the company supplying the equipment); *AT&T Info. Sys.*, 627 F. Supp. at 1401–03 (unit pricing not exempt under exemption 4 where predictions of competitive injury were too speculative). Both courts touted the strong public interest in disclosing prices awarded in government contracts. *See Racal-Milgo Gov't Sys.*, 559 F. Supp. at 6 (describing the disclosure of contract pricing as "a cost of doing business" with the government); *AT&T Info. Sys.*, 627 F. Supp. at 1403 (same). But neither case stands for the blanket rule that FOIA exemption 4 does not apply to line-item prices. Nor does either case provide support for Hodes's argument that the commission percentages are total contract prices. Moreover, both cases predate D.C. Circuit decisions which make clear that line-item pricing data can be withheld under exemption 4 if it satisfies the *National Parks* test. *See, e.g.*, *Canadian Commercial*, 514 F.3d at 41 (rejecting a per se rule that pricing data must be disclosed); *McDonnell Douglas I*, 180 F.3d 303, and *McDonnell Douglas II*, 375 F.3d 1182 (noting that line-item pricing information in a government contract falls within FOIA exemption 4 if it satisfies the *National Parks* test).

In sum, the Court finds that to the extent the commission percentages are "prices" at all, they are more akin to line-item (rather than to total) prices. Each of the four categories of tax debt collections are "line items" or "deliverables" to recover tax debts that fall within specified financial ranges. Thus, the commission percentage—the multiplier used to calculate each *line-item* price—is just *one* of several numbers used to calculate the total contract price.

**B.      Whether the Commission Percentages Are Confidential Information Under Exemption 4**

As noted, courts apply the two-part *National Parks* test to determine whether commercial or financial information is "confidential" under exemption 4. 498 F.2d at 770. Applying this test here, the Court concludes that the defendants have satisfied both prongs of the test.

First, disclosing the commission percentages would cause substantial harm to the debt collection companies' competitive positions should the IRS decide not to renew the task order contract for future option years and re-bid the contract. *See* Gregory Decl. ¶¶ 12, 16, 17. As the declarations of the IRS and three of the four task order awardees—ConServe, CBE Group, Inc., and Performant Recover Inc.—make clear, disclosure of the commission percentages would enable competitors to (1) gain insight into the awardees' pricing strategy and (2) underbid the awardees in future competitive bidding processes for IRS debt collection or other similar contracts. Gregory Decl. ¶ 25; CBE Group Decl. ¶ 5, Dkt. 13-6; Performant Recovery Decl. ¶¶ 16, 17, Dkt. 13-7; ConServe Decl. ¶¶ 18, 20, 21, 22, Dkt. 14-2. Because the D.C. Circuit has held that releasing line-item pricing in contracts that contain option years substantially harms a contractor "by informing the bids of its rivals in the event the contract is rebid," *McDonnell Douglas II*, 375 F.3d at 1190, the Court reaches the same conclusion here.[8]

---

[8] Two of the awardees also state that they would suffer additional competitive harm because other federal agencies and customers could require them to match the IRS commission percentages on future contracts. *See* CBE Group Decl. ¶ 5; Performant Recovery Decl. ¶¶ 16,

Second, disclosing the commission percentages also would impair the IRS's ability to get necessary information in the future. As Gregory explains, should the IRS decide to expand its debt-collection program, new bidders might draw misleading inferences about their competitors' pricing approach that could cause bidders to include unrealistically low commission percentages. Gregory Decl. ¶¶ 22, 23. Gregory predicts that this could compromise a new bidder's performance and lead to increased contract administration costs. *Id.*

Hodes argues that the IRS should be able to detect whether a bidder's low bid puts it at risk of poor performance, particularly because the IRS "does not evaluate the price offered by a debt collection company in a vacuum, but i[t] also considers each competing contractors' [sic] relevant experience, past performance, and operating plan for conducting collection operations and complaint process in evaluating a potential awardee's ability to meet the RFQ's requirements for high quality performance." Gregory Decl. ¶ 24. But as Gregory explains, commission percentage prices are based on each vendor's "assessment of the effort that will be required to perform under the contract with regard to the vendor's cost accounting structure, profit objectives and financial condition." *Id.* ¶ 18. Thus, it is plausible that even a small drop in a percentage rate could be perilous for a new bidder that is in weak financial condition or has an unrealistic aspiration about its profitability and ability to perform. *Id.* ¶ 23.

Balanced against this risk, the Court must consider the public's countervailing interest in "be[ing] informed about what its government is up to." *Canadian Commercial*, 514 F.3d at 40 (internal quotation and alteration marks omitted). In this case, the public knows the outer percentage rate that the government could pay because commission percentage ceilings are

_____

17(b). It is established, however, that the "identified harm must flow[] from the affirmative use of proprietary information by competitors." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 563 (D.C. Cir. 2010) (internal quotation marks omitted).

publicly available in GSA contracts.  Gregory Decl. ¶ 13.  Consequently, knowing the precise commission percentage discounts "would seem to shed little if any light upon the agency's performance of its statutory duties."  *McDonnell Douglas II*, 375 F.3d at 1193 (internal quotation marks omitted).  On "rough balancing," *Wash. Post*, 690 F.2d at 269, the Court finds that disclosing the commission percentages would impair the IRS's ability to get accurate bids in the future, and that impairment is significant enough to justify withholding the precise commission percentages here.

### C.      Whether the Commission Percentages are Segregable

When a FOIA exemptions applies, as is the case here, the government is required to release *any* part of the disputed record that can be reasonably segregated as nonexempt.  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).  Accordingly, "[b]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."  *Id.*  A finding of segregability is required "even if the requester did not raise the issue of segregability before the court."  *Id.*

According to Gail Minauro—the IRS's Senior Disclosure Specialist in Governmental Liaison and Disclosure at the IRS's office in Detroit, Michigan, who processed Hodes's FOIA request—the *only* information that the IRS withheld from the task order contracts under FOIA exemption 4 were the commission percentages.  Minauro Decl. ¶ 7, Dkt. 13-4 (explaining that the IRS redacted 24 separate commission percentages on each of the four task order contracts under FOIA Exemption 4).  *Id.*  Given that the commission percentages are the only part of the task order contracts that the IRS redacted and withheld under FOIA exemption 4, the Court finds that there is no remaining nonexempt information that can be segregated and disclosed to Hodes.

**CONCLUSION**

For the foregoing reasons, the Court will grant the IRS's and ConServe's motions for summary judgment and deny Hodes's cross-motion for summary judgment. Because the Court will grant the IRS's motion for summary judgment, the Department of the Treasury's motion to dismiss will be denied as moot. A separate order consistent with this decision accompanies this memorandum opinion.

_____
**DABNEY L. FRIEDRICH**
United States District Judge

September 28, 2018